# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

JOHN K. STEPHENS,

                Petitioner,          :      Case No. 3:19-cv-249

    - vs -                              District Judge Thomas M. Rose
                                               Magistrate Judge Michael R. Merz

TIM SHOOP, Warden,
   Chillicothe Correctional Institution,

                                        :

                Respondent.

# REPORT AND RECOMMENDATIONS

This is an action pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus brought by Petitioner John Stephens with the assistance of counsel. It is ripe for decision on the merits on the Petition (ECF No. 1), the State Court Record (ECF No. 7), the Return of Writ (ECF No. 8), and Petitioner's Reply/Traverse[1] (ECF No. 20).

As a post-judgment collateral attack on a criminal conviction, the case was automatically referred to the undersigned pursuant to General Order Day 13-01.

---

[1] The Traverse begins with a four-page Preface reminding this Court of its duty to uphold the Constitution and complaining that the state courts lacked the "intestinal fortitude" to do so. (ECF No. 20, PageID 929-32). The opinion for the Second District was written by Judge Mary Donovan who has spent her entire legal career in public service, much of it as a public defender. In this Court's experience, she has never lacked the courage to vigorously defend the constitutional rights of criminal defendants, however unpopular the crimes with which they are charged.
The Preface also contains interesting references to other current events: e.g., deliberate abuses of the FISA Court, COVID-19, and civil unrest in the wake of the killing of George Floyd. As Petitioner argues, these events should not distract the Court from its duty to uphold the Constitution. So why mention them?

**Litigation History**

Stephens was indicted on October 8, 2015, by the Montgomery County grand jury on three counts of rape of a child under ten years of age (Indictment, State Court Record, ECF No. 7, Ex. 1). Having failed to persuade the trial court to suppress the evidence against him, he pleaded no contest to the three charges, reserving his right to appeal the suppression decision. *Id.* at Exhibit 10. The Plea Agreement provided the State would not seek revocation of his community control (probation) sentence in a prior child sex abuse case and would allow that case to be terminated administratively. Additionally, it would make no objection to his serving concurrently the three fifteen years to life sentences on the convictions. Stephens was sentenced as agreed.

Stephens appealed to the Ohio Second District Court of Appeals which affirmed denial of the motion to suppress. *State v. Stephens,* 2017-Ohio-9230 (Ohio App. 2nd Dist. Dec. 22, 2017), appellate jurisdiction declined, 2018-Ohio-1990 (2018). Stephens then filed his Habeas Corpus Petition in this Court, pleading two grounds for relief:

> **GROUND ONE**: Stephens' right to due process of law was violated when he was compelled to make incriminating statements by his court-ordered treatment provider as part of successful completion of the program to avoid being returned to state prison, in violation of the Fifth and Fourteenth Amendments.

> **GROUND TWO**: Stephens' right to due process of law was violated when he was subjected to the functional equivalent of custodial interrogation, without first being apprised of his *Miranda* rights, in violation of the Fifth, Sixth and Fourteenth Amendments.

(Petition, ECF No. 1, PageID 25-36).

**The Factual Basis of the State Courts' Decisions**

Stephens strongly contests the factual findings on which the Second District based its decision.

The relevant facts as found by the Second District are as follows:

[*P2]  After violating the terms of his probation in Case No. 2013 CR 3550, Stephens was sentenced to prison for thirty-six months. On May 7, 2015, the trial court issued an entry granting Stephens judicial release. One of the conditions of his judicial release required Stephens to become a resident of Talbert House, a locked-down and secured rehabilitation facility where defendants receive sex offender therapy. Stephens was required to complete the sexual offender program at Talbert House. If he failed to complete the program, Stephens would be sent back to prison.

[*P3]  Although the record is unclear regarding the specific dates, Stephens was allowed to participate in the sexual offender program at Talbert House once before in 2013 or 2014 in Case No. 2013 CR 3550, but was discharged before completing the program because of a probation violation. Thus, we note that the instant case represents the second time that the trial court permitted Stephens to participate in the sexual offender program at Talbert House.

[*P4]  Upon arriving at Talbert House on May 14, 2015, Stephens was processed as an incoming resident by administrative specialist Patricia Stanley. Stanley testified that she was familiar with Stephens because he had been placed in the program once before and indicated that this was the second occasion upon which she had "briefed him for intake." Part of the briefing packet Stanley provided Stephens with included State's Exhibit I, the confidentiality form, which stated in pertinent part:

> Federal Laws and Regulations do not protect information about suspected child abuse or neglect from being reported under State Law to appropriate State or Local authorities.

After Stanley explained and reviewed the confidentiality form with Stephens, she watched him sign the document.

[*P5]  Once admitted, Stephens was required to participate in sexual offender treatment at Talbert House. To facilitate his treatment, Stephens was assigned to a small group which met three times a week for two hours each session. Stephens' group was

3

moderated by Sherry Peterson, a clinical service provider for the sexual offenders at Talbert House in 2015. When beginning treatment, Peterson testified that she always initially reviews the confidentiality form with her "clients" and explains that she is a mandated reporter with a legal duty to warn, and if anyone tells her that they have caused harm to a child or elder, is going to cause harm to a child or elder, or cause harm to themselves, she has a duty to report that information to the police. Peterson further testified that due to the serious nature of their charges, she always specifically explains to sexual offender groups that "if they tell me that they've committed an [previously undisclosed] offense on a child or elder" confidentiality may be breached.

 [*P6]  Stephens had been placed in sexual offender treatment for an offense involving only one victim. However, on June 2, 2015, as part of a work assignment for Peterson's group treatment class, Stephens turned in five index cards, each containing the initials of a different victim. Peterson testified that she was surprised by Stephens' actions because in her experience, she never had a "client" admit to previously undisclosed victims as part of the assignment. Peterson further testified that she assumed Stephens would only want to discuss the victim and offense for which he had been convicted. Peterson testified that during the group meetings she tries not to guide her "clients" regarding what they want to talk about. In fact, Peterson testified that she never told Stephens that he had to provide any names or initials as part of the assignment. After Stephens turned in the index cards, the only question Peterson asked him was "do the people know about these right here?" to which Stephens responded in the negative. Peterson asked no additional questions regarding the previously undisclosed victims during the group meeting. We note that Peterson testified that there was only one other "client" for the group meeting held that day. Peterson testified that because of her duty to report, she immediately went to Linda Stout, her supervisor, for her guidance on what steps to take in light of Stephens' admissions.

 [*P7]  As an additional component of the sexual offender treatment, Peterson instructed her "clients" to keep a journal of their thoughts and feelings. Peterson testified that she did not tell her "clients" what to write in the journal, and Stephens did not write in his journal during class. Peterson testified that the "clients" were aware that she was going to review their journal entries. On June 4, 2015, Stephens submitted his journal to Peterson. In his journal, Stephens disclosed additional initials, which he had not listed on the index cards submitted to Peterson on June 2, 2015. Peterson brought the additional initials to Stout's attention, and on June 4, 2015, Stout

4

contacted the Talbert House legal department, otherwise known as QCS. QCS directed Stout to contact the police. Stout contacted Lieutenant Cavanaugh from the Kettering Police Department. Lt. Cavanaugh then contacted Detective Gary Schomburg who had previously investigated Stephens' underlying conviction in Case No. 2013 CR 3550 for gross sexual imposition. Det. Schomburg spoke with Stout on June 4, 2015, and she informed him that Stephens had potentially disclosed additional sex offense victims in his journal and on index cards during his treatment at Talbert House. Det. Schomburg directed Stout to send him copies of the relevant documents but did not ask her to obtain any additional information from Stephens regarding his admissions. Stout then contacted QCS in order to confirm it was acceptable to transfer the documents to Det. Schomburg. QCS instructed Stout to send copies of the documents to Det. Schomburg. QCS also instructed Stout to inform Stephens that the documents were being disclosed to the police.

[*P8] On June 5, 2015, Stout contacted Schomburg via telephone and informed him that she could provide the documentation to him. The documents were later transmitted via fax to Det. Schomburg. After speaking with Det. Schomburg, Stout and Peterson had a meeting with Stephens in Stout's office. At the beginning of the meeting, Stout reviewed the Talbert House confidentiality agreement with Stephens. Stephens acknowledged that he first reviewed the agreement when he was processed into the program, and again when he initially met with Peterson when his treatment began. Stephens also acknowledged that he had signed the confidentiality agreement. Stout also reiterated that she and Peterson were mandatory reporters who were legally required to report sex abuse of a child to the police. Therefore, Stout informed Stephens that she was required to report to the police the additional victims he had disclosed during his treatment at Talbert House.

[*P9] At that point, Stephens indicated that there was one less victim than the number that Stout had indicated. Stephens stated that the initials I.A. and B.A. on the index cards were the same person, and he listed her initials twice because he "offended on her twice." Stout asked Stephens if he had anything else to tell them, and he disclosed the full name of another child that he had abused. Stout testified that Stephens informed her that he felt relieved for having disclosed the additional sex offenses. However, when Stephens reviewed the initials R.R. which he had disclosed, he became upset and requested an attorney. At that point, the meeting was concluded, and Stout made arrangements for Stephens to retain counsel.

5

[*P10]  After the meeting, Stout contacted Det. Schomburg to verify that he had received the faxed documents. Stout informed Det. Schomburg of the actual names of the additional victims that Stephens provided during the earlier meeting. Stout also informed Det. Schomburg that Stephens had requested that an attorney be present during any questioning by the police.

[*P11]  On October 8, 2015, Stephens was indicted for three counts of rape of a child under ten years of age. At his arraignment on October 15, 2015, Stephens pled not guilty to the charges in the indictment. Shortly thereafter, Stephens filed a motion to suppress on October 28, 2015. [footnote omitted] Stephens amended and supplemented his motion to suppress on November 4, 2015, and December 14, 2015. A hearing was held on said motion on February 4, 2016, after which, both parties were permitted to file post-hearing memoranda in support of their respective positions. In a decision issued on March 14, 2016, the trial court overruled Stephens' motion to suppress in its entirety.

[*P12]  On July 22, 2016, Stephens entered a plea of no contest to each count in the indictment. On August 12, 2016, Stephens was sentenced to a mandatory term of fifteen years to life in prison on each count, the sentences to run concurrently.

*Stephens*, 2017-Ohio-9230.

In the Petition Stephens states his strong disagreement with those factual findings while conceding it is his burden to overcome them by clear and convincing evidence:

20. Contained within the Opinion of the Second District is a recitation of the purported factual and procedural history from the state trial court that is replete, in the eyes of Stephens and his counsel, with inaccuracies. These binding factual findings "shall be presumed to be correct[,]" and as such, Stephens must assume "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Warren v. Smith,* 161 F.3d 358, 360-61 (6th Cir. 1998).

(ECF No. 1, PageID 20.

As part of the relief requested in the Petition, Stephens requests that the Court "[c]onduct an evidentiary hearing in which proof may be offered concerning the allegations in this Petition." *Id.* at PageID 37.  However the ability of a district court to conduct an evidentiary hearing in a

habeas case has been severely restricted by the Supreme Court in *Cullen v. Pinholster*, 563 U.S. 170 (2011).  Before the Court can conduct an evidentiary hearing on the merits, Stephens must show that the Second District's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d)(2).

**Sources of Factual Disagreement**

Stephens relies on several sources of factual disagreement with the Second District.

**A.  The Road to Freedom Workbook**

In its findings of fact, the Second District relied heavily on the testimony of Sherry Peterson, identified as a clinical service provider for the sexual offenders at Talbert House. Stephens agrees the Second District accurately summarized her testimony (Traverse, ECF No. 20, PageID 933).  However, he asserts "its factual finding that Mr. Stephens was not prompted to disclose "other" victims or "other" acts is wholly inaccurate. The strongest evidence to this point, and in direct conflict with the state appellate court's factual findings, is the very content of Mr. Stephens' Road to Freedom workbook." *Id.* Stephens then quotes from this workbook for six pages. *Id.* at PageID 933-38.

The Second District opinion does not mention the Road to Freedom workbook at all.  But Stephens' brief on appeal also does not mention it (State Court Record, ECF No. 7, Ex. 14).  In his Post-Hearing Memorandum on the Motion to Suppress in the trial court, Stephens makes only one reference to the workbook. *Id.* at Ex. 6, PageID 314, (referencing without quoting page 23).  In his Decision of the Motion to Suppress, Judge Adkins recounts Stephens' testimony at the hearing which

only included one oblique reference to the workbook. *Id.* at Ex. 9, PageID 371. Finally in his Traverse, Stephens relies entirely on quoted text from the workbook without adverting to any testimony he gave at the suppression hearing about his understanding of the workbook and any obligations it imposed on him.

The Second District's factual findings, then, are based on its evaluation of the oral testimony about what Stephens was told and what he understood about what he was told, rather than upon any analysis of the text of the workbook. In contrast to his lengthy reliance on the workbook in his Traverse, Stephens did not rely in the state courts on the workbook as the source of his understood obligations to disclose other victims. The workbook was in the appellate record as an exhibit, but Stephens made no claim that he understood his obligations in the treatment program from the workbook in contrast to what staff, principally Ms. Peterson, told him.

A court should be able to rely on the structure of the argument in a case before it that is presented by counsel in briefing. A state prisoner ordinarily does not 'fairly present' a federal claim to a state court if that court must read beyond a petition, a brief, or similar papers to find material that will alert it to the presence of such a claim. *Baldwin v. Reese*, 541 U.S. 27 (2004). The same must be said of evidence that is present in one exhibit but not called to the court's attention in briefing.

### B. Voluntariness of Sex Offender Treatment at Talbert House

Stephens also disagrees with the Second District's determination "that Mr. Stephens was not required to engage in treatment and was free of cohesion [sic] while in sex-offender treatment at Talbert House." (Traverse, ECF No. 20, PageID 939, citing *Stephens*, 2017-Ohio-9230, ¶ 25). What Judge Donovan actually wrote was

> In the instant case, Stephens requested, and was granted, judicial release from prison for his conviction in Case No. 2013 CR 3550.

> Successful completion of judicial release meant that Stephens agreed to participate in sex offender treatment. While we note that Talbert House is a lock-down facility and "clients" were not free to leave, it was Stephens' choice to attend the sessions, and a decision not to attend or participate would not increase his original sentence. During the sessions, he was free to discuss his previous sex offenses, or not.

*Id.* Stephens had been judicially-released after serving a year of a thirty-six month committed sentence which had been imposed on him for violating the conditions of his community control sentence in *State v. Stephens*, Case No. 2013-CR-03550[2]. In the prior case, he had been subject to thirteen conditions of community control including "8. A requirement that the offender be assessed for and complete inpatient sex offender treatment at the Community Correctional Center;" (ECF No. 1-3[3], PageID 235). On April 29, 2014, Judge Adkins gave Stephens notice of a community control sanctions violation hearing. It had been reported to the judge that Stephens had failed to comply with seven of the thirteen conditions of community control. However, the violation he was being called to answer was

> 7 "I shall accomplish all case plan objectives which are now and will be set for me throughout my supervision." You failed to complete the Community Correctional Center program. Subsequently you were discharged from the program on April 23, 2014, for communicating with your children after being told you were to have no contact with them by your Probation Officer and Community Correctional Center staff.

(ECF No. 1-4, PageID 239). The Termination Entry (ECF No. 1-5) does not recite what violation was found by the court.

After he was indicted on the new charges, the Common Pleas Court notified him of a hearing to answer the following charge:

---

[2] Stephens pleaded guilty in this case to gross sexual imposition on a victim under the age of thirteen.
[3] As noted below, this document was not part of the appellate record before the Second District.

> You violated Rule #7, "I shall accomplish all case plan objectives which are now and will be set for me throughout my supervision period." You were unsuccessfully discharged from residential Sex Offender Treatment at the Community Correction Center (CCC) on October 13, 2015. According to the Clinical Supervisor at the CCC Program, you are still not accepting full responsibility for your involvement in the instant offense [i.e. the gross sexual imposition on a minor under thirteen].

Stephens now argues:

> When considering the records from Mr. Stephen' original case, Case No. 2013-CR-03550 (Docs. 1-3, 1-4, 1-5, 1-6, 1-7, & 1-8; PageID # 235-54), it is unfathomable that the state appellate court erred on such a simple, straight forward, fact of procedural history. There should be no dispute, on factual grounds, that Mr. Stephens was required to complete treatment at Talbert House or he would be sent to prison. Further, that his treatment was unquestionably mandatory.

(Traverse, ECF No. 20, PageID 940).  From this he concludes:

> When not considering the procedural history of his original case, as was attached to his Petition (Case No. 2013-CR-03550), the state appellate court contradicts itself on the factual grounds supporting Mr. Stephens' two stints at Talbert House.

*Id.*

It was this argument that led the Magistrate Judge to order additional briefing after the Traverse was filed (ECF No. 21).  And the result of that briefing is the Stipulation of the Parties that documents from the first case (2013-CR—3550), including those relied on to show the procedural history Stephens claims the Second District got wrong, were not in the appellate record in the second case (See Stipulation, ECF No. 26-1).  A court of appeals is strictly limited to the record on appeal.  It can hardly be faulted for not taking into account whatever facts are shown by court documents from the first case when those documents were not made part of the record before it.  And this habeas court is limited to evaluating the state courts' fact finding by the evidence that was before those courts.  *Pinholster, supra.*

**B. State Actors**

Lastly, Stephens argues the Second District unreasonably determined that Ms. Peterson and her supervisor, Ms. Stout, were not "acting as agents of law enforcement officials because they were employed by Talbert House" (Traverse, ECF No. 20, PageID 940, citing *Stephens, supra,* at ¶ 28). Instead, Stephens asserts,

> All employees of Talbert House operate under the umbrella of the Community Correction Center. The Community Correction Center operates under the purview of the Ohio Department of Rehabilitation and Correction. As such, they were not simply employees of a treatment facility for sex offenders (private, non-profit, et cetera), they were employed by a multi-level executive agency, established by the Ohio General Assembly and run as an operation of law by the Executive Branch, more specifically, by and through the Department of Rehabilitation and Corrections.

(Traverse, ECF No. 20, PageID 940-41, citing ECF No. 19 PageID 927.) The referenced page is on Talbert House letterhead signed Ms. Stout and identified in the index to ECF No. 19 as an internal Talbert House memorandum. It shows the address of Talbert House as "Community Corrections Center, 5234 W. State Route 63, Lebanon, Ohio." How that single page establishes that Ms. Peterson and Ms. Stout were agents of law enforcement requires leaps of inference not supported by anything in the record that Stephens references.

At the paragraph complained of (¶ 28), the Second District made no finding about the corporate status of Talbert House or whether it was controlled in some sense by the Ohio Department of Rehabilitation and Corrections. All it decided was that Peterson and Stout were not acting as "agents of law enforcement officials," but rather in their capacity as mandatory reporters of instances of child abuse.

The duty to report child sexual abuse, particularized for "mandatory reporters," is an instantiation of the offense of misprision of felony, which derives from English common law. See

11

Perkins & Boyce, Criminal Law 572 (3d ed. 1982). The obligation as imposed on all citizens of Ohio is codified at Ohio Revised Code § 2921.22(A) which provides "No person, knowing that a felony has been or is being committed, shall knowingly fail to report such information to law enforcement authorities." Citizens who obey their duty to report felonies are not acting as agents of law enforcement, although their actions are certainly in support of law enforcement. Instead, they are obeying a duty directly imposed on them by statute[4].

In any event Stephens has provided no reference to evidence in the state court record or Ohio authority that shows that mandatory child abuse reporters are, when obeying their duty to report, acting as agents of law enforcement.

Although Stephens captions this portion of his Traverse as "State Actors," he makes no argument on the question whether Ms. Peterson and Ms. Stout count as "state actors" under the Fourteenth Amendment. Purely private entities can be state actors for that purpose. See, e.g. *Burton v. Wilmington Parking Auth.,* 365 U.S. 715 (1961). The pertinent question for this case is whether they were agents of law enforcement, not whether they were state actors within the meaning of Fourteenth Amendment jurisprudence.

In conclusion, Stephens has not shown by clear and convincing evidence that the Second District's factual findings about Stephens' obligations in the treatment program or the status of Talbert House and its employees are erroneous. In determining whether the Second District's decision is contrary to or an objectively unreasonable application of Supreme Court precedent, the Magistrate Judge treats the Second District's findings of fact as binding.

---

[4] There are very few prosecutions for misprision generally. However prosecutions under the mandatory reporter statute have been far more prominent. For example, the Roman Catholic Archdiocese of Cincinnati pleaded no contest to a charge of failure to report shortly after the clerical sex abuse scandal became national news in 2002.

## Legal Analysis

**Ground One:  Violation of the Privilege Against Self-Incrimination**

In his First Ground for Relief, Stephens claims his privilege against self-incrimination was violated when he was compelled to make incriminating statements by his court-ordered treatment provider as part of successful completion of the program to avoid being returned to state prison, in violation of the Fifth and Fourteenth Amendments.

Stephens combined both these claims in his single assignment of error on direct appeal which the Second District decided as follows:

> [*P14]  Stephens' sole assignment of error is as follows:
>
> [*P15]  "THE CONSTITUTIONAL RIGHTS OF JOHN STEPHENS WERE VIOLATED WHEN HE WAS COMPELLED TO MAKE INCRIMINATING STATEMENTS BY HIS COURT-ORDERED TREATMENT PROVIDER, IN VIOLATION OF PROGRAM POLICIES, WHICH WERE LATER USED TO INDICT MR. STEPHENS."
>
> [*P16]  In his sole assignment, Stephens contends that the trial court erred when it overruled his motion to suppress the disclosures he made to Talbert House staff regarding the additional minor victims that he sexually abused. Specifically, Stephens argues that he was coerced by Talbert House staff into making incriminating statements without being first advised of his *Miranda* rights.
>
> [*P17]  In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford,* 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley,* 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592, 639 N.E.2d 498. "Accepting those facts as true, we must independently determine as a matter of law, without

deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

[*P18]  "The right to [*Miranda*] warnings is grounded in the Fifth Amendment's prohibition against compelled self-incrimination." *State v. Strozier,* 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 16 (2d Dist.), citing *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). "The procedural safeguards prescribed by *Miranda* apply only when persons are subjected to 'custodial interrogation.'" *State v. Thomas*, 2d Dist. Montgomery No. 20643, 2005-Ohio-3064, ¶ 27, citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[*P19]  *Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. "[T]he ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

[*P20]  "In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *State v. Hoffner,* 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 27, citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Therefore, "the test for custody is an objective test." *State v. Chenoweth,* 2d Dist. Miami No. 2010 CA 14, 2011-Ohio-1276, ¶ 8, citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). "The subjective views of the interviewing officer and the suspect are immaterial to the determination of whether a custodial interrogation was conducted." (Citations omitted.) *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 22. Accord *State v. Gray*, 2d Dist. Montgomery No. 26139, 2016-Ohio-1419, ¶ 74.

[*P21]  On appeal, Stephens argues that the trial court erred when it denied his motion to suppress because when he revealed information regarding the previously undisclosed victims, he did so under threat of being sent back to prison. Stephens further argues that he was in custody for the purposes of *Miranda*, and therefore,

14

he should have been informed of his constitutional rights before being questioned by Peterson and Stout. Additionally, Stephens contends that Peterson and Stout were acting as agents of law enforcement when they questioned him about the undisclosed victims.

[*P22]  In support of his arguments, Stephens relies on a case from the First District Court of Appeals, *State v. Evans*, 144 Ohio App.3d 539, 760 N.E.2d 909 (1st Dist.2001), where it was held that some of the statements disclosed to counselors by a juvenile, who was under involuntary commitment for treatment, were not admissible against the juvenile. In *Evans*, the court noted that the "classic penalty situation" contemplated in *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), often arises in the context of sexual abuse treatment programs where participants are required to divulge specific criminal acts "putatively for therapeutic reasons." Id. at 557. The court also reasoned that Evans' participation in the program was not voluntary and the penalty for his failure to participate was substantial because it would result in a penalty for violating a court order. *Id*. at 558. Thus, according to the court, "Evans was unconstitutionally forced to choose between a substantial penalty and self-incrimination." *Id*. The facts in the instant case are distinguishable from those presented in Evans.

[*P23]  As explained in *Evans* at 557-558, 760 N.E.2d 909, there are three issues that define the limits of a "classic penalty" situation:

> But other courts have had the occasion to define the limits of the "classic penalty" situation. Where (1) the treatment program has been deemed voluntary because it is a condition of initial  parole eligibility, (2) the penalty is insubstantial because the resultant facility transfer is to another medium-security prison and therefore essentially lateral, and (3) the denial of parole does not automatically follow from a refusal to speak, then although the defendant's constitutional privilege has admittedly been burdened, the burden is held to be sufficiently mitigated.

[*P24]  In *State v. Barker*, 5th Dist. Richland No. 16CA49, 2017-Ohio-596, the court stated as follows:

> Imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda. Howes v. Fields,* 565 U.S. 499, 132 S.Ct. 1181, 1190, 182 L.Ed.2d 17 (2012). When a prisoner is questioned, the determination of whether the prisoner is in custody should focus on all of

the features of the interrogation. *Id.* at 1192. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted. *Id.* An inmate who is removed from the general prison population for questioning and is subjected to treatment in connection with the interrogation "that renders him 'in custody' for practical purposes ... will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.*

*Id.* at ¶ 11.

[*P25] In the instant case, Stephens requested, and was granted, judicial release from prison for his conviction in Case No. 2013 CR 3550. Successful completion of judicial release meant that Stephens agreed to participate in sex offender treatment. While we note that Talbert House is a lock-down facility and "clients" were not free to leave, it was Stephens' choice to attend the sessions, and a decision not to attend or participate would not increase his original sentence. During the sessions, he was free to discuss his previous sex offenses, or not. Significantly, Peterson testified that although Stephens was expected to provide information regarding his underlying conviction, he was neither expected nor encouraged to provide any information regarding previously undisclosed offenses. Peterson did not directly or indirectly ask Stephens to provide information with respect to uncharged offenses in the exercise with the index cards or the personal journal he created. Stephens was not coerced into participation in the index card and journal exercise at Talbert House, and what he wanted to disclose during the treatment sessions was entirely at his discretion. On this record, Stephens' decision to disclose the additional victims was a voluntary one and not the product of coercion by Peterson or Stout. Therefore, we find that the record establishes that Stephens was not in custody for the purposes of *Miranda*.

[*P26] Additionally, neither Peterson nor Stout were law enforcement officers such that they were required to provide Stephens with *Miranda* warnings. Both Peterson and Stout were employees of Talbert House, not law enforcement officers. Generally, questioning by law enforcement is required to trigger the necessity for *Miranda* warnings. On the other hand, the United States Supreme Court has recognized the applicability of *Miranda* in situations not involving law enforcement. The "duty of giving *'Miranda* warnings' is limited to employees of governmental agencies whose function is to enforce law, or to those acting for such law enforcement agencies by direction of the agencies; it does not include private citizens not directed or controlled by a law

enforcement agency, even though their efforts might aid in law enforcement." *State v. Bolan,* 27 Ohio St.2d 15, 18, 271 N.E.2d 839 (1971). (Emphasis added).

[*P27] In *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), syllabus, the U.S. Supreme Court held that a psychiatrist, who performed an involuntary evaluation of the defendant, could not testify regarding information that had been gathered by questioning during the evaluation, because the defendant had not been apprised of his Fifth Amendment rights. The examining physician was not a law enforcement officer, but the Court held that the doctor went beyond a routine examination and gathered information during the evaluation to testify concerning the defendant's future dangerousness and to assist the prosecution in seeking the death penalty. "[T]hose tangentially associated with the criminal justice system, but without the requisite statutory authority, are not law enforcement officials for the purposes of *Miranda*." *Evans* at 553.

[*P28] Here, neither Peterson nor Stout were acting as agents of law enforcement officials when they collected and eventually reported Stephens' admissions regarding the undisclosed victims. Unlike the treatment counselors in *Evans* who were employees of the juvenile court, Peterson and Stout were at all pertinent times employees of Talbert House. While it is undisputed that Peterson and Stout both had a duty to report any previously undisclosed sex offenses against children, this fact, standing alone, did not render them state actors for the purposes of *Miranda*. Significantly, Stephens was already on notice that Peterson and Stout were mandatory reporters prior to disclosing the additional victims. Therefore, once they became aware that Stephens had committed sexual offenses against several previously undisclosed victims, Peterson and Stout had a legal obligation to inform the proper authorities. Before Stephens' admissions came to light, Peterson and Stout worked with him for treatment purposes only. At no time was Stephens under any compulsion or threat from Peterson or Stout to make any admissions regarding the undisclosed victims. There is no evidence that Stephens was threatened with punishment for failure to admit uncharged offenses or that he was even initially questioned with respect to anything other than his involvement in the underlying offense. There is also no evidence that Peterson or Stout originally suspected that Stephens committed additional crimes and were seeking to obtain his confession.

[*P29] Furthermore, the meeting on June 5, 2015, attended by Stephens, Peterson, and Stout was only held to inform Stephens that

they had a mandatory duty to report his disclosures to the police. The record establishes that the purpose of the meeting was not to interrogate Stephens or coerce him into providing additional admissions. Specifically, Stout began the meeting by reviewing the confidentiality agreement and the duty to report. Stephens acknowledged that he reviewed the confidentiality agreement. Stout testified that Stephens inquired as to why she had to report the undisclosed victims to the police. Stout testified that she showed Stephens the index cards and the journal and stated that he had admitted to abusing a number of previously undisclosed victims. Without encouragement of any kind, Stephens immediately corrected Stout as to the number of victims and stated that B.A. and I.A. were the same victim, and provided the child's full name and nickname. Stout then asked Stephens if there was anything else he wanted to tell them, and he provided the full name of another previously undisclosed victim. It was only when he acknowledged the initials R.R. that he became upset and asked for an attorney. At that point, Stout terminated the meeting.

[*P30] Upon review, we find that the record establishes that at no time was Stephens directed by Stout or Peterson to provide the full names of his additional victims. Stephens even testified that he was never asked to provide specific names. Rather, the record establishes that he provided some of the undisclosed victims' names on his own when he interrupted Stout during the meeting. Accordingly, we find that Stephens was not subject to an interrogation at the meeting on June 5, 2015, and he was therefore, not entitled to be informed of his *Miranda* rights.

[*P31] Lastly, Stephens argues that all of his statements and written admissions were involuntary and violated the Due Process clause of the United States Constitution. "The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no person shall be 'deprived of life, liberty or property without due process of law.' Confessions that have been coerced by the state and therefore have been involuntarily given have long been held to violate this guarantee of due process." *Evans* at 560, 760 N.E.2d 909.

[*P32] In light of the foregoing analysis, we agree with the trial court and find that neither Stout nor Peterson were acting on behalf of the police when Stephens disclosed the initials and names of the additional child victims. Therefore, *Miranda* did not apply. Additionally, we find that Stephens was on notice prior to beginning his treatment that Stout and Peterson had a duty to report any previously undisclosed sex offenses against children to the police.

18

Yet after being warned, Stephens still disclosed the initials and names of several additional victims. Therefore, we find that the trial court did not err when it denied Stephens' motion to suppress.

[*P33]  Stephens' sole assignment of error is overruled.

*Stephens*, 2017-Ohio-9230.

Respondent does not raise any affirmative defenses to the Petition, agreeing that it is timely and that Stephens has appropriately exhausted all available state court remedies,  Instead, Respondent defends on the merits, asserting the Second District's decision is entitled to deference under the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA") as codified at 28 U.S.C. § 2254(d)(1) and (2).

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court.  28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).  Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Stephens argues first that the Second District unreasonably applied *Minnesota v. Murphy*, 465 U.S. 420 (1984).  In *Murphy* the defendant had made incriminating admissions in response to questions at a required meeting with his probation officer; the probation officer was prompted to ask the questions by a report from a counselor in the sex offender treatment program Murphy was attending on court order.  The Supreme Court held his failure to claim the privilege at the time of making the admissions was fatal to his later claim of the privilege, even though the probation officer had not

advised him about the privilege.

In its opinion, the Court first recognized the long-standing principle that an incriminating statement made in any setting without claiming the privilege can later be used in a criminal proceeding. *Murphy*, 465 U.S. at 426, quoting *Lefkowitz v. Turley,* 414 U.S. 70, 78 (1973). In other words, the Fifth Amendment privilege is not self-executing.[5] Murphy was under an obligation to report regularly to his probation officer and answer questions truthfully. The Court found this did not preclude him from claiming the privilege just as it can be claimed by any witness subpoenaed and compelled thereby to testify. *Murphy*, 465 U.S. at 427 and see footnote 5. It is apparently undisputed that Stephens never asserted the privilege in his interactions with Peterson and Stout.

The *Murphy* Court also noted that the Constitution does not prohibit asking questions expected to elicit incriminating answers:

> It has long been recognized that "[the] Constitution does not forbid the asking of criminative questions," *United States v. Monia, supra, at 433* (Frankfurter, J., dissenting), and nothing in our prior cases suggests that the incriminating nature of a question, by itself, excuses a timely assertion of the privilege. See, e. g., *United States v. Mandujano,* 425 U.S. 564, 574-575 (1976) (plurality opinion).

*Murphy*, 465 U.S. at 428. Unlike the situation in *Murphy*, Stephens' disclosures were not in response to criminative questions from Peterson or Stout, but in his responding to what he perceived were questions put to him by the Road To Freedom workbook. As the Second District found, Peterson denied that interpretation of the workbook. But even if the workbook had contained language such as "You must reveal the identity of victims and circumstances of prior child sexual abuse," nothing prevented Stephens from claiming the privilege in response. A person on the witness stand in open court who is asked a criminative question is in a far less ambiguous

---

[5] A recent example of a client following good legal advice on this point is Jeffrey Epstein's assertion of the privilege when asked in a civil deposition about sexual misconduct with minors.

and compelling situation than Stephens was[6].

The *Murphy* Court also acknowledged that there are exceptions to the requirement to assert the privilege, the principal one being that for a criminal suspect under interrogation in police custody who has not been advised of his Fifth and Sixth Amendment rights per *Miranda*. *Murphy*, 465 U.S. at 429-30. Murphy was found not to be in custody for *Miranda* purposes "since there was no "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Murphy*, 465 U.S. at 430-31, citing *California v. Beheler,* 463 U.S. 1121, 1125 (1983) (*per curiam*) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977)).

Stephens was a resident of Talbert House, a locked-down, secure facility, when he made the incriminating admissions. But he had not been arrested nor was he at that time a suspect in any of the three cases of rape of a child under ten to which he eventually pleaded. The *Murphy* Court noted that the probation officer could compel Murphy's "attendance and truthful answers," but this did not make the setting coercive because Murphy was subjected to

> less intimidating pressure than is imposed on grand jury witnesses, who are sworn to tell the truth and placed in a setting conducive to truthtelling. Although warnings in both contexts might serve to dissipate "any possible coercion or unfairness resulting from a witness' misimpression that he must answer truthfully even questions with [incriminating] aspects," *United States v. Washington*, 431 U.S., at 188, we have never held that they must be given to grand jury witnesses, *id.,* at 186, and we decline to require them here since the totality of the circumstances is not such as to overbear a probationer's free will. See *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

*Murphy*, 465 U.S. at 431.

Stephens asserts his case comes within the "classic penalty" exception to the obligation to assert the privilege (Traverse, ECF No. 20, PageID 945-48). He relies principally on *Garrity v.*

---

[6] The Fifth Amendment does forbid the practice of calling a criminal defendant to the witness stand and forcing him to assert the privilege in the face of his jury.

*New Jersey*, 385 U.S. 493 (1967). In *Garrity*, police officers accused of ticket fixing were interrogated by state law enforcement officers and told that if they refused to answer questions on Fifth Amendment grounds they would be fired. Stephens claims his situation is analogous because he would have been discharged from Talbert House and returned to prison if he did not provide the information that incriminated him. The analogy is unpersuasive. Stephens made no claim in the state courts that he was told he would be discharged if he did not provide information on past offenses. The Second District found as a matter of fact that he was free to provide that information or not. Unlike the investigators in *Garrity*, Ms. Peterson and Ms. Stout were not acting as agents of law enforcement.

**Ground Two: Subjection to Custodial Interrogation without *Miranda* Warnings**

In his Second Ground for Relief he asserts he was subjected to what amounted to custodial interrogation without being read his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). In support he relies on *Estelle v. Smith*, 451 U.S. 454 (1981), *Howes v. Fields,* 565 U.S. 499 (2012), and *Stansbury v. California*, 511 U.S. 318 (1994) (*per curiam*).

Respondent claims Stephens was not in custody so as to require he be given *Miranda* warnings. (Return, ECF No. 8, PageID 732). Petitioner concedes that *Howes* is the relevant Supreme Court precedent which prescribed the following factors to be considered: "(1) location of the questioning; (2) duration of the questioning (3) statements made during questioning; (4) the presence or absence of physical restraints during the questioning; and (5) the release of the interviewee at the completion of questioning." (Traverse, ECF No. 20, PageID 949, quoting *Howes*, 565 U.S. at 509.) Stephens also notes the *Howes* Court's distinguishing between station house interrogation and that of persons incarcerated:

> The *Howes* Court provides three "strong grounds" for further defining the operative analysis of custodial status of an incarcerated individual: (1) lower level of shock value when a prisoner is summoned for questioning as opposed to a citizen being plopped off the street, thus a prisoner is accustomed to the lock-down environment and it does not involve the same "inherently compelling pressures" found at a traditional station house interrogation; (2) reduced risk of being lured into speaking by "longing a promise for prompt release" because the prisoner will be returned to his or cell while the individual who is yanked off the street is seeking to go home; and (3) the fact that a prisoner knows that the interrogator will most-likely not be able to increase the speed in which he or she is released, while on the other hand, a suspect snatched from the public will be inherently "compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess."

(Traverse, ECF No. 20, PageID 950, quoting *Howes*, 565 U.S. at 511-12 (internal citation omitted)).

The Magistrate Judge finds Stephens' attempt to distinguish *Howes* to be unpersuasive. Stephens was already in a locked-down facility when he gave up the information; he knew he could not go leave whether or not he revealed prior child sex abuse crimes. Stephens was not asked criminative questions by Peterson or Stout nor threatened nor physically restrained. He was released back into the general Talbert House population after having made the relevant incriminating admissions[7].

At the end of his Traverse, Stephens circles back to his factual argument:

> It is wholly unreasonable to believe, let alone to hold as a concrete fact, that if Mr. Stephens' clinicians were so very adamant about not requesting the initials of individuals other than the victim for which Mr. Stephens was prosecuted and punished, that the two interrogations of Mr. Stephens that occurred after the initial disclosure to law enforcement were not, in fact, interrogations for law enforcement purposes. Based upon their own testimony, what need would exist for the full names of the alleged victims when they did not want to know about the initials of those individuals in the first place? Like much of the conclusions of the state appellate court, it is unfathomable, let alone reasonable.

---

[7] Stephens asserts Peterson and Stout "had almost immediate authority to release him early from confinement." He offers no record citation to support that assertion. (Traverse, ECF No. 20, PageID

(ECF No. 20, PageID 956).

The trial court heard competent testimony from Ms. Peterson and Ms. Stout on the subjects about which they testified. Determination of credibility on a suppression motion is assigned to the judge who heard the witnesses; nothing to which they testified is physically impossible. The Second District deferred to the trial court's credibility determinations and so must this Court. To put it another way, we cannot reject the factual conclusions of a state court merely on a conclusion by a party that the testimony is "unreasonable."

Our task under 28 U.S.C. § 2254(d)(1) is not to decide whether the Second District was right. We can grant relief only if no fair-minded jurist could have reached the same conclusions. *Harrington v. Richter,* 562 U.S. 86, 101 (2011)(quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). The state court decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *White v. Woodall,* 572 U.S. 415, 420 (2014).

**Conclusion**

Petitioner has not shown that the Second District's application of clearly established federal law, particularly Murphy and Howes, is objectively unreasonable. The Magistrate Judge therefore respectfully recommends the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, it is also recommended that Petitioner be denied a certificate of appealability and that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis.*

24

July 30, 2020.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. Counsel are reminded that any objections are subject to S. D. Ohio Civ. R. 7.2(b)(5).